**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NANCY MURRAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.  05 C 1229** |
| **v.** | ) | |
| | ) | **HONORABLE DAVID H. COAR** |
| **GMAC MORTGAGE CORPORATION** | ) | |
| **d/b/a DITECH.COM** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Nancy Murray ("Murray" or "Plaintiff") has brought suit on behalf of a putative

class of consumers against GMAC Mortgage Corporation d/b/a Ditech ("GMACM" or

"Defendant") for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq* ("FCRA").

Before this Court are Plaintiff's Renewed Motion for Class Certification (Docket No. 112),

Defendant's Motion for Summary Judgment (Docket No. 129), and Plaintiff's Motion for

Summary Judgment (Docket No. 138).

## FACTS[1]

GMACM is a residential mortgage lender that uses direct mailings to attract new

customers.  In order to select recipients for the mailing considered here, GMACM would

communicate its chosen credit characteristics to a direct mail list vendor, who then pre-screened

consumers' credit information and produced a mailing list.  Pl.'s Facts ¶¶ 20-21.  A number of

---

[1]These facts are derived from the parties' statements of facts filed pursuant to Local Rule
56.1(b).  Unless otherwise indicated, the facts included herein are undisputed.

different parties and considerations played a role in finalizing the design of the mailing at issue here. GMACM's preparation of the mailing required: completion of a "sign-off" sheet containing a list of things to be done before sending, Def.'s Facts ¶ 10; review for FCRA compliance by GMACM's associate counsel Peter Hender and compliance manager Shanna Gilroy, *id.* ¶¶ 11-12, 15-16; and additional review of the proposed mailer by the outside list vendor, *id.* ¶¶13-14. The mailing under consideration in this case was sent to 10,071,186 people nationwide between October 15, 2004 and April 14, 2005. Pl.'s Facts ¶ 15. In response, 5,813 recipients applied for credit, of which 3,478 actually received loans that, on average, amounted to between $111,200 and $116,300. Pl.'s Facts ¶¶ 16-18.

Plaintiff, who resides in Joliet, Illinois, received a direct mailing from Defendant. Pl.'s Facts ¶3; *see* Compl. Ex. A. The document states in part:

> [Y]ou've been PRE-APPROVED for a loan by ditech.com which means you can take advantage of the equity in your home to <u>get money for whatever you need</u>.

The letter continues by lauding the terms and competitiveness of GMACM's mortgage services in text that is accentuated with bolding, underlining, font variation, and graphic elements. The front of this mailer contains little in the way of substantive information, offering only a possible savings amount that expressly states that "[y]our financial situation may vary from the above hypothetical situation." Several comments such as "You're Pre-Approved!" and "Lowest Costs GUARANTEED" are footnoted, and a comment at the very bottom of the page tells the reader to "See reverse side for important information." Readers are encouraged to "call one of [their] friendly loan officers today at 800-395–5610."

On the back side of this mailer, all information is printed in text smaller than all but a few of the words printed on the front.  Other than the inclusion of a small "Equal Housing Opportunity Lender" logo at the beginning of the text and a bold subsection heading stating "Best Cost Guarantee Terms and Conditions," there is no use of color, graphic cues, or textual variation to draw the reader's eye to particular words.  At the top is an explanation of the rates and amounts used to calculate the hypothetical loan amounts mentioned on the front of the mailer, followed by a sampler of conditional language:

> "[E]xcludes mortgage taxes and CTLA policies.  Terms and conidtions apply.  Loans will be secured by your property.  Subject to underwriting approval.  Not all applicants will be approved.  Taxes and insurance are extra.  Property insurance required.  Fees & charges may apply.  Appraisal may be required in certain cases.  Rates and terms may vary by state.  Rate effective 8/27/04 but subject to change without notice.  Other rates and terms available.  Please call for details."

On the bottom half of this text GMACM provides additional information required under FCRA:

> Applicants must complete a credit application so that ditech.com can assess credit worthiness in order to determine which loan program, interest rate and fees the applicants are most qualified for.

> This guarantee offer expires December 31, 2004 and may be withdrawn at any time upon the sole discretion of ditech.com.

> We used information from a credit bureau in connection with this offer and you received this offer because you satisfied the criteria for creditworthiness we used to screen persons for this offer.  Our offer is subject to: 1. You're [sic] continuing to meet the criteria for this prescreened offer 2. Your ability to give us a first mortgage lien on your property; 3. Your credit report, credit history, income and employment continue to meet our underwriting standards; and 4. We receive a satisfactory title and appraisal on your home.

> Ditech.com may broker your loan to a third party.

> You may prohibit the use of information in your credit report for future prescreened offers [by contacting credit reporting agencies whose contact information was included].

Upon receiving the mailer, a recipient could contact ditech to pursue a mortgage. A loan agent would then ask a series of questions to determine where the consumer fell on a "rate sheet" that was updated daily with the most recent relevant figures. *See* Def.'s Facts ¶¶ 9-10, 12. The final mortgage details were also impacted by the borrower's decisions regarding the allocation of costs and differences in loan terms. *Id.* ¶ 11. Loan agents had no discretion to deviate from the formulas outlined on the rate sheet. *Id.* ¶ 14. The parties contest the extent to which the loan terms could be determined prior to this telephone conversation, *see* Resp. to Def.'s Facts ¶ 13, as well as the question of whether any "normal consumer who responded to the [mailing]" was at least eligible for some sort of mortgage loan, *see id.* ¶ 15.

After receiving this mailing, Plaintiff did not respond to the mailing other than to file a complaint on March 1, 2005. *See* Pl.'s Facts ¶ 6. Plaintiff alleges in the complaint that, in preparing the mailing, Defendant accessed "a consumer report on plaintiff without plaintiff's consent or any lawful reason, in violation of [FCRA]." Compl. ¶ 1. Plaintiff further alleges that the mailer represented by Exhibit A "does not qualify as a 'firm offer of credit' within the meaning of the FCRA," in that "the purported offer is vague and totally lacking in terms. It has no value beyond a solicitation for loan business, the sending of which is not a permissible purpose for accessing a consumer report." *Id.* ¶ 19(b). Finally, Plaintiff claims that, in contravention of the disclosure requirements of § 1681m(d), "the required statements are not clear and conspicuous as required." *Id.* ¶ 19.

The suit was brought on behalf of a putative membership consisting of two classes; a "§1681b Class" and a "§1681m(d)" class. Renewed Cert. Mot. at 1. Both parties have now filed motions for summary judgment.

## ANALYSIS OF MOTION FOR CLASS CERTIFICATION

Under Rule 23(a), a proposed class must satisfy four conditions before a court will grant certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). In addition to Rule 23(a), a proposed class plaintiff must also satisfy at least one of the conditions in Rule 23(b); Plaintiff contends that common questions predominate, and that class action will therefore be superior to other available methods of resolving the controversy in satisfaction of Rule 23(b)(3).

This suit was brought on behalf of two classes: a "§1681b Class" consisting of "all persons with mailing addresses in Will County, Illinois, to whom defendant sent material in the form represented by the solicitation attached hereto as Exhibit A, on or after March 1, 2003, for whom address information can be identified, but excluding all those who received a loan from defendant"; and a "§1681m(d) Class" consisting of "all persons with mailing addresses in Will County, Illinois, to whom defendant sent material in the form represented by the solicitation attached hereto as Exhibit A, on or after March 1, 2003 and on or before November 30, 2004, for whom address information can be identified, but excluding all those who received a loan from defendant." Renewed Cert. Mot. at 1. Defendant contends that certification should be denied on the grounds that: Plaintiff has failed to establish numerosity or the means to develop a list of class members; it has not been established that Murray or her counsel are willing and able to bear the cost of class notice; that individual actions represent a more practical adjudicative

approach, in part because of the possibility of "annihilating" damages; and the range of possible damages for each putative member means that individual issues predominate. *See generally* Def.'s Resp. to Cert. Mot. Plaintiff predictably disagrees, arguing that common questions of law and fact predominate, and that class litigation is a more fair and efficient method of adjudicating the dispute.

    a.    <u>Numerosity</u>

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Although there is no "magic number" of class members for numerosity purposes, case law indicates that when a class numbers at least 40, joinder will be considered impracticable. *Swanson v. Am. Consumer Indus.*, 415 F.2d 1326, 1333 (7th Cir. 1969).

Defendant asserts that discovery has failed to produce a list of mail recipients that would make up the putative class, and that furthermore, no such list exists. According to Defendant, Plaintiff therefore cannot prove that any resident of Will County other than Murray has received the mailing from which FCRA liability arises. Defendant also states that the burden is on Plaintiff to prove this required element for class certification, and that her speculation and assumptions regarding total class size are therefore insufficient.

This Court is reluctant to reward Defendant for "shopping out" the different responsibilities of direct mailing by finding in its favor on this issue. Many direct marketers operate in this manner, and finding in favor of Defendant on this ground would allow the entire industry an easy means of escaping FCRA class actions. Market realities no doubt make specialization a practical necessity, but the confusion that it creates should not give every such

mailer a free pass from Rule 23. This Court will now consider Plaintiff's proposed technique for determining class membership.

Plaintiff attempts to prove the approximate size of the putative class through an admittedly coarse calculation:

> Discovery has shown that 1.2 million residents of Illinois receives the same mailer as Plaintiff. Plaintiff has also shown that four percent of Illinois residents live in Will County. If the pattern holds, therefore, approximately 48,000 Will County residents would be memebrs of the putative class.

Pl.'s Cert. Reply at 7. Even if the pattern does not prove entirely consistent, it is nonetheless reasonable to intuit from these unchallenged figures that more than forty Will County residents received the same mailer.

As for Defendant's claim that the class list is too indefinite to allow certification, that argument is also unavailing. Defendant is correct that Plaintiff has made certification more difficult by requiring that all putative class members be concretely located. *See* Renewed Cert. Mot. at 1. (defining the class based on recipients "for whom address information can be identified"). However, GMACM readily admits that a company by the name of Marketernet was resonsible for assembling the mailing list in question, and does not deny that Marketernet stated that it would be possible to reassemble the list once should these proceedings demand it. *See* Pl.'s Cert. Reply at 9 (citing correspondence with Oscar Marquis, counsel for Marketernet). It is not unreasonable to suppose that by requiring those offering credit under FCRA to retain their prescreening criteria for three years, the Act foresaw that rebuilding mailings in this mannder might prove necessary. *See* 15 U.S.C. § 1681m(d)(3). At this stage, the only real impediment to the process is cost, which is an inadequate ground for denying certification.

Plaintiff has presented an acceptable technique by which the class list can be determined. If for whatever reason that technique fails, this Court retains the right to decertify the class should class membership prove unascertainable. However, at this point the putative class is sufficiently certain and large to avoid denial of certification on numerosity.

        b.    <u>Commonality</u>

Under Rule 23(a)(2), there must be a question of law or fact common to the class. Rule 23(b)(3), discussed below, more stringently requires that the common questions of law or fact predominate over questions pertaining to individual class members. Commonality generally exists when the defendant has engaged in "standardized conduct" towards the members of the proposed class. *Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 2006 WL 715788, at *4 (N.D. Ill. Mar. 22, 2006). Plaintiff maintains that "the only issue," once the claim under section 1681m(d) is removed, is whether the mailer complies with FCRA's "firm offer" exception, something that can be determined on a class-wide basis.

The question of the mailing's compliance with FCRA provides a common issue of fact and law that is applicable to all members of the putative class. This Court finds that Murray has made a sufficient showing that the class members share at least one common question, and that Plaintiff has therefore satisfied the commonality requirement.

        c.    <u>Typicality</u>

A plaintiff's claim is typical of a proposed class if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cit. 1983). Further, "factual distinctions between the claims of the named class members and those

of other class members" do not necessarily defeat a finding of typicality. *Id.* at 233. The issue instead turns on whether the plaintiff's claims "have the same essential characteristics" as those of the proposed class members. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 599 (7th Cir. 1993). As with the commonality prong, all parties potentially have a claim based on FCRA and the fact that they received Exhibit A. Minor factual discrepancies aside, all putative class members have "the same essential characteristics," and therefore typicality has been established.

d.    Adequacy of Representation

Rule 23(a)(4) requires that the named plaintiff "fairly and adequately protect the interests of the class." The plaintiff must not have claims antagonistic to or in conflict with those of other class members, and must have sufficient interest in the case's outcome to be a vigorous advocate. *See Chapman v. Worldwide Asset Mgmt.*, L.L.C., 2005 WL 2171168, at *4 (N.D.Ill. Aug. 30, 2005).

Defendant claims that Murray has not met this Rule 23 requirement because she and her counsel have not demonstrated the means and willingness to bear the cost of notifying the class. In light of the many FCRA claims have been brought by this Plaintiff, with the advice of the same counsel, this Court sees no reason to doubt that they are capable of raising the approximately $16,000 that would be required. *See* Pl.'s Cert. Resp. at 8.

The second consideration in determining adequacy of representation is whether plaintiff's counsel is qualified, experienced, and able to conduct the proposed litigation. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Plaintiff's counsel has appeared before multiple courts in this Circuit and has an extensive practice focused on consumer protection issues.

Counsel has litigated numerous FCRA cases, including *Cole v. U.S. Capital, Inc.*, 389 F.3d 719

(7th Cir. 2004); *see also Chapman*, 2005 WL 2171168, at *5 (finding the same firm was capable

of providing adequate counsel in FCRA class action).  Plaintiff's counsel satisfies the adequacy

of representation prong.

      e.     <u>Rule 23(b)(3)</u>

The Seventh Circuit has addressed the propriety of certification of this class quite

directly.  "That actual loss is small and hard to quantify is why statutes such as the Fair Credit

Reporting Act provide for modest damages without proof of injury.  Rule 23(b)(3) was designed

for situations such as this, in which the potential recovery is too slight to support individual suits,

but injury is substantial in the aggregate."  *GMAC Mortg.*, 434 F.3d at 953.  Though the

appellate court's opinion did not settle the matter, this Court nonethelesss approaches this

certification with the Seventh Circuit's opinion in imind.

Under Rule 23(b)(3), a plaintiff must show that common questions of law or fact

predominate over individual questions, and "that a class action is superior to other available

methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3);

*Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997).  "The matters pertinent to the finding

[under Rule 23(b)(3) ] include: (A) the interest of members of the class in individually

controlling the prosecution or defense of separate actions; (B) the extent and nature of any

litigation concerning the controversy already commenced by or against members of the class; (C)

the desirability or undesirability of concentrating the litigation of the claims in the particular

forum; (D) the difficulties likely to be encountered in the management of a class action." Fed. R.

Civ. P. 23(b)(3).  The predominance inquiry is significantly more demanding than the

commonality requirement of Rule 23(a)(2). *Amchem Prods.*, 521 U.S. at 623-24. If individual issues predominate over common questions, then a class action generally is not a superior method for resolving the controversy because managing the disparate issues involved will be inefficient. *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001).

Plaintiff alleges that Defendant violated FCRA when they requested, furnished, and/or used the proposed class members' consumer reports without their consent and without a lawful reason for the purpose of sending them a sales solicitation. Based on a variety of different grounds, Defendant maintains that individual matters predominate and that individual suits would therefore be more efficient. Defendant also points to the "likely annihilating" damages that might result from certification of the class.

Again, the essential facts are clear, and applicable to each and every putative class member. Defendant accessed consumer credit information in bulk and sent mailings to those consumers who satisfied selected criteria. The intent in accessing the information and sending the mailing was the same for each member of the class. Each potential member of the class received the same pre-printed mailer, containing the same "pre-approval notice" and listing the same consumer disclosures. The FCRA violation alleged is based on Defendant's actions in accessing consumer credit information and sending a mailing that may or may not have met the requirements of the Act. The primary facts and legal questions are identical. Indeed, this Court has previously granted certification in similar cases, as have other courts, under the general approval of the Seventh Circuit. *See, e.g., Murray v. Sunrise Chevrolet*, No. 04-7668, Mem. Op. (N.D. Ill. Sept. 15, 2005).

The Seventh Circuit addressed these very issues in *GMAC Mortgage*. 434 F.3d 948. Regarding Defendant's argument about the need for individualized determinations concerning the existence of a "firm offer of credit," the *GMAC Mortgage* court stated: "The statutory definition of 'firm offer' does not ask about how consumers *react*, however; it asks what the offeror has done – what terms have been extended, whether they are honored if a consumer accepts." *Id.* at 955. Further, the Seventh Circuit elaborated on its holding in *Cole*. "We do not read *Cole*, however, to require a consumer-by-consumer evaluation. An offer has value to 'the consumer' if it is useful to the *normal* consumer. *Cole*'s objective was to separate *bona fide* offers of credit from advertisements for products and services, determining from '*all* the material conditions that comprise the credit product in question ... [whether it] was a guise for solicitation rather than a legitimate credit product.'" *Id.* at 955-56 (citing *Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 728 (7th Cir. 2004)). However, this in no way requries a case-by-case analysis of each consumer, so allowing each individual claimant to try identical, common issues would be entirely wasteful and inefficient.

Finally, as a largely equitable matter, Defendant claims that certification should be denied based on the disproportionately large pecuniary impact in relation to the injuries involved. FCRA permits damages of $100 to $1,000, and it is true that the ultimate award could be quite high. This issue is customarily taken up after certification, *see GMAC Mortgage*, 434 F.3d at 954, but Defendant urges the Court to consider it now in light of the high likelihood of settlement once the class is certified.

The substantial nature of a potential damages award, even one based on merely "technical" violations of FCRA, is not a proper ground on which to deny class certification. *Id.*

at 953-54 ("Reducing recoveries by forcing everyone to litigate independently-so that constitutional bounds are not tested, because the statute cannot be enforced by more than a handful of victims-has little to recommend it.").  As the Seventh Circuit stated, "[t]he reason that damages can be substantial...does not lie in an 'abuse' of Rule 23; it lies in the legislative decision to authorize awards as high as $1,000 per person...combined with [defendant]'s decision to obtain the credit scores of more than a million persons."  *Id.*  Although an extremely large and disproportionate award can raise due process issues, denial of class certification is not necessarily the preferred, or even the appropriate, option for resolving those concerns.  An excessive award may be reduced, if warranted, but such constitutional limits "are best applied after a class has been certified."  *Id.* at 954 (citing *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2003)).  The statute must be enforced in its present form, not in the form that would be most convenient to Defendant.

Defendant also maintains that Plaintiff has not adequately established an injury, but the violation of privacy that results from unwarranted credit reports is sufficient.  *In re Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328 (N.D. Ill. 2002) (citing *Doe v. County of Montgomery*, 41 F.3d 1156, 1159 (7th Cir. 1994)).

This is a case where class certification presents the most efficient means of adjudicating the controversy.  The class is numerous but the potential recovery for each member quite small.  Indeed, it is exceedingly unlikely that many individuals would wish to go to court for a potential recovery of $100–or that they could find counsel willing to represent them.  In light of the Seventh Circuit's prior rulings, and the efficiencies provided under Rule 23, in this instance class

certification is the most appropriate means of resolving the issues in this matter.  Therefore, Plaintiff's renewed motion for class certification is GRANTED.

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT MOTION

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law.  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party."  *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

Even so, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, he must go beyond the pleadings and support his contentions with proper documentary evidence.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In order to successfully oppose a motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, *see Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must decide, based on admissible evidence, whether any material dispute of fact exists that requires a trial.  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A non-moving party who bears the burden of proof on a specific issue must demonstrate by specific factual allegations that there is a genuine issue of material fact in dispute. *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir. 1989). This evidence provided by the non-movant must be sufficient to enable a reasonable jury to find in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## ANALYSIS OF MOTION FOR SUMMARY JUDGMENT

In its motion for summary judgment, Defendant claims: (1) that a firm offer was made in satsfaction of § 1681b(c) of FCRA according to the standards of the Seventh Circuit set down in *Cole v. U.S. Capital*, 389 F.3d 719 (7th Cir. 2004), and *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006); (2) that Plaintiff has no private right of action under section 1681m; and (3) that there is no evidence that GMACM acted "knowingly and intentionally" as required under *Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603 (7th Cir. 2005). *See generally* Def.'s Summ J. Mem. Plaintiff responds and seeks summary judgment, claiming that the mailing adequately demonstrates Defendant's willful failure to provide a "firm offer of credit" and disclose consumer rights in a "clear and conspicuous manner," and that the egregiousness with which it did so provides sufficient evidence on which a reasonable jury could find that the violations were made willfully. *See generally* Pl.'s Summ. J. Mem.; Pl.'s Summ. J. Resp.

For the reasons stated below, Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part. Defendant's motion for summary judgment is GRANTED in part and DENIED in part.

a.    Whether there was a "firm offer"

Under FCRA, it is permissible for a credit reporting agency to furnish a consumer's credit report, and for others to use that report, only with the written consent of the consumer or for certain "permissible purposes." *See* 15 U.S.C. § 1681b. One of the designated "permissible purposes" is to make a "firm offer of credit" to the consumer. 15 U.S.C. § 1681b(c)(1)(B)(I). The statute defines a "firm offer of credit" as "any offer of credit ... to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer." 15 U.S.C. § 1681a(1). The offer of credit may be conditioned on: the consumer's ability to meet pre-established "specific criteria bearing on credit worthiness or insurability"; verification that the consumer still meets the original screening criteria; and/or consumer's ability and willingness to provide pre-established, disclosed collateral. 15 U.S.C. § 1681a(*l*)(1-3).

In determining whether a mailing meets the statutory definition of a firm offer, "a court must consider the entire offer and the effect of all the material conditions that comprise the credit product in question. If, after examining the entire context, the court determines that the 'offer' was a guise for solicitation rather than a legitimate credit product, the communication cannot be considered a firm offer of credit." *Perry v. First Nat'l Bank*, 459 F.3d 816, 824 (7th Cir. 2006) (citing *Cole*, 389 F.3d at 727-28; *Murray*, 434 F.3d at 955-56 (warning against "a sham offer used to pitch a product rather than extend credit")). This process starts with an evaluation of the

underlying loan or line of credit, and asks the court to consider whether it has independent worth to the consumer, or whether it is so valueless that it can only be an inducement toward some other end. *Compare Cole,* 389 F.3d 719 (concluding that the line of credit was simply a sham intended to induce the purchase of a car) *with Perry,* 459 F.3d 816 (finding that a small but otherwise unencumbered line of credit represented value to the consumer).

However, the ultimate value of the product is only one factor in considering the value of the offer itself. As the Seventh Circuit summarized its prior holding in *Cole*, the offer there was deemed a sham in part because the underlying line of credit was essentially valueless, but also because "it was not clear that credit approval was guaranteed," and "the precise rate of credit and other material terms were not included in the solicitation." *Perry*, 459 F.3d at 824 (citing *Cole*, 389 F.3d at 728). These additional factors must provide some independent value, otherwise the recipient of pre-screened directed mail – who has given up a modicum privacy through the use of his or her credit report – is treated no better than a non-recipient consumer; *Cole* demands that the former be placed in a better position than the latter. "From the consumer's perspective, an offer of credit without value is the equivalent of an advertisement or solicitation." *Cole*, 389 F.3d at 726-27. It is this approach to value that this Court now takes up with respect to the instant mailing, insofar as "[a] definition of 'firm offer of credit' that does not incorporate the concept of value to the consumer upsets the balance Congress carefully struck between a consumer's interest in privacy and the benefit of a firm offer of credit for all those chosen through the pre-screening process." *Id*.

Defendant's mailing does not offer much in terms of the hallmarks of a "firm offer." Instead, it amounts to an invitation to deal, encouraging recipients to submit a "credit application

so that ditech.com *can assess* credit worthiness in order to determine which loan program, interest rate and fees the applicants are most qualified." *See* Exhibit A. On the face of the document, it states twice that the recipient is "pre-approved," but in a footnote places weighty conditions on that pre-approval. While some of the additional conditions are expressly allowed under FCRA, *see* 15 U.S.C. 1681a(*l*), the number and opacity of the conditions make the offer elusory, requiring applicants to meet unexplained "underwriting standards" and present a "satisfactory" title and appraisal on the applicant's home.

These highly conditional terms amount to no terms at all, and certainly do not provide enough information for consumers to evaluate whether the offer is worth pursuing. There is essentially no substantive information from which a recipient of the mailing could begin to guess the worth of the offer to them as an individual. *Cole*, 389 F.3d at 728 ("[B]oth [debtor and creditor] must know the other terms attached to that credit to determine whether it is advantageous to extend or to accept the offer."). Defendant is of course corrrect that not *every* term needs to be contained in the mailing in order to amount to a firm offer; however, in this case the allegedly firm offer contains *no* term or rate. The closest that Defendant comes to providing any detail within the four corners of the mailer is the hypothetical mortgage it uses to calculate potential savings. However, even this provides little to no basis for determining what terms a consumer might actually receive: the front of the mailer expressly states that the mentioned savings are based only upon a hypothetical from which "your financial situation may vary"; the rates on which the hypothetical is based were only effective months before the first mailings went out; and the back of the mailer lists a number of unelaborated exceptions and conditions.

That there is a more or less formal, streamlined process in place for those customers who choose to contact Defendant is not evidence of a firm offer if the process is identical to that which any other customers would face. In this instance, any certainty in the prospective debtor's position resulting from pre-screening quickly disappears, as the only truly relevant information is that which is exchanged at the application phase. *See, e.g.,* Def.'s Facts ¶ 15 ("[I]f a person met GMACM's pre-set selection criteria at the time they were prescreened but no longer met those criteria when they applied for a loan...they would no longer qualify for the offer."). This means that, at the time a mailing recipient chooses to call in to GMACM operators, they are treated no differently than a consumer straight off the street. Defendant has therefore provided no evidence that the mailing provides any value to its recipients.

GMACM defends its failure to provide details of the offer by asserting that more specific rates and terms could be determined by looking at other Defendant publications or by contacting Defendant at the number listed on the mailer. However, that mailing recipients could cobble together a firm offer by doing extra work provides no grounds for finding a firm offer within the mailing itself. The Seventh Circuit noted in considering this case that "the statutory definition of 'firm offer' does not ask about how consumers react, however; it asks what the offeror has done-what terms have been extended, whether they are honored if a consumer accepts." *GMAC Mortgage,* 434 F.3d at 955. Therefore, when deciding whether a creditor has adhered to FCRA, "a court need only determine whether the four corners of the offer satisfy the statutory definition (as elaborated in *Cole*), and whether the terms are honored when consumers accept." *Id.* at 956. This Court finds it impossible to consider the second step in the analysis here, as the mailing is so unlike a firm offer that there are essentially no terms that could be honored.

Defendant also claims that it could not have offered a "guarantee" as such, or provided more precise rates or terms, because of the nature of mortgage lending. However, that is irrelevant to this Court's analysis. Defendant had a responsibility to meet the demands of the law and, finding that it was not pragmatic or possible to do so, it had the option of not sending this mailing. The bottom line is that it did not provide such terms, and therefore did not meet the "firm offer" requirements of FCRA.

Defendant correctly points out that courts should be wary of dictating to consumers which loan and credit products have value. However, the Seventh Circuit and FCRA have given courts the power and responsibility to ensure that mass mailings used to promote such products have value, and are not simply solicitations. An offeror cannot "use[] credit histories to identify potential [customers]." *Murray*, 434 F.3d at 955. Granted, the line around "firm offers" cannot be solely determined by the presence of absence of terms such as total loan amount, or the rate of interest, or the term of repayment. However, FCRA requires that courts distinguish between those mass mailings that simply seek to entice new customers using sales pitches, and those firm offers that provide something of value in exchange for infringing on consumer's privacy.

It is true that some courts have found a firm offer of credit based on a similar amount of information as that which is provided here. *See, e.g., Murray v. HSBC Auto Fin., Inc.*, 2006 WL 2861954 (N.D. Ill. Sept. 27, 2006) (denying summary judgment based on presence of firm offer in light of ability to contact a phone number and a listed hypothetical) (Andersen, J.). However, as this Court reads *Cole* we must find value to justify the invasion of privacy that credit report disclosure represents. 389 F.3d at 726-27. The instant mailing provides only a hypothetical that almost certainly is inapplicable to the mailing recipient, along with a phone number through

which the recipient can walk through the same process as any other consumer; these simply do not amount to value for the recipient, as the recipient of the letter is no better off than the non-recipient consumer.

While not all terms need be contained within the mailing itself, *Cole* at least makes clear that the bulk of this Court's analysis should focus on the mailing itself. It is clear from that mailing that what Defendant purports to be a "firm offer" is in fact nothing more than a solicitation. Plaintiff's motion for summary judgment is GRANTED with respect to this issue.

b.     Whether the terms were "clear and conspicuous"

Plaintiff also maintains that the disclosures required under FCRA were not written in a manner that was "clear and conspicuous." Defendant attacks this claim on the grounds that: (1) there is no longer a private right of action under 1681m, Def.'s Summ. J. Mem. at 10-12; and (2) Defendant met FCRA's demand for "reasonable procedures for assuring compliance" as set forth in 1681m(c), id. at 12-13.

In addition to the existence of a "firm offer of credit," FCRA requires that any such firm offer must provide a "clear and conspicuous statement" of certain information. 15 U.S.C. § 1681m(d)(1). The creditor must disclose that: 1) it used information from the consumer's credit report in connection with the offer; 2) the consumer received the offer because she satisfied the creditor's criteria for credit worthiness; 3) failure to meet the section criteria or any applicable criteria bearing on credit worthiness may cause the creditor to rescind the offer; 4) the consumer has a right to prohibit her credit report from being used in connection with any credit transaction that she does not initiate; and 5) she may exercise her right to "opt out" of such credit transactions by contacting a specified toll-free number or by sending a written request to the

credit agency at a given address. 15 U.S.C. § 1681m(d)(1). The statute does not define "clear and conspicuous" and case law provides little guidance. *Cole*, 389 F.3d at 729. Courts seeking to clarify the term's meaning have turned to commercial law and cases relating to the Uniform Commercial Code ("UCC") or the Truth In Lending Act ("TILA") for assistance. *Id.* (citing *Stevenson v. TRW Inc.*, 987 F.2d 288, 295 (5th Cir.1993); *Tucker v. New Rogers Pontiac, Inc.*, 2003 WL 22078297, at *4 (N.D.Ill. Sept. 9, 2003); *Sampson v. Western Sierra Acceptance Corp.*, 2003 WL 21785612, at *3-4 (N.D.Ill. Aug. 1, 2003)).

FCRA created a private right of action for enforcing the "clear and conspicuous" requirements of section 1681m. However, congress repealed this power in 2003 by passing the Fair and Accurate Credit Transactions Act ("FACTA") and making administrative remedies the only means for enforcing these rules. Pub.L. 108-159, § 311(a) (amending the Act with 15 U.S.C.A. § 1681m(h)(8)); *Perry v. First Nat'l Bank*, 459 F.3d 816, 823 (7th Cir. 2006) ("The unambiguous language of § 1681m(h)(8) demonstrates that Congress intended to preempt private causes of action to enforce § 1681m."). The repeal has no impact on solicitations or offers made before the FACTA provision went into effect on December 1, 2004. *See* 16 C.F.R. § 602.1(c)(3)(xiii) (2004) (setting the effective date); *Murray*, 434 F.3d at 951 (noting that the amendments "do not apply to offers made before [the amendments'] effective date."). Plaintiff has therefore attempted to avoid the timing problem by limiting the §1681m(d) Class to dates that fell before FACTA's effective date. Defendant argues, however, that the claim must also be filed before this date in order to maintain a valid action under this section of FCRA.

This Court need not answer this question. Because the mailing does not contain a firm offer, there is no reason to consider the secondary question of whether or not the necessary

disclosures were laid out in a "clear and conspicuous" manner. The claims at issue in the instant case involve two distinct causes of action under FCRA, one of which is conditional on the other:

> The definition of a "firm offer of credit," contained in §§ 1681a(l) and 1681b(c)(1)(B), does not include a requirement to give any disclosures. The disclosures described in § 1681m(d) are a separate and subsequent requirement, implicated only when a firm offer of credit is made, and the failure to provide these disclosures does not strip a solicitation of its status as a firm offer of credit. The Seventh Circuit recently recognized this distinction in *Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 729 n. 11 (7th Cir.2004), noting that "[t]he requirements of clear and conspicuous disclosures are only triggered if a valid firm offer was extended .... Consequently, if a solicitation is not provided pursuant to § 1681b(c)(1)(B), i.e., it is not a firm offer of credit, § 1681m(d) is not applicable." *Id.* A violation of § 1681m, therefore, does not nullify a firm offer of credit and does not create a separate violation of § 1681b.

*Murray v. Household Bank (SB), N.A.*, 386 F.Supp.2d 993 (N.D. Ill. 2005). The Seventh Circuit has therefore interpreted 1681m(d) as applying only to those offers that satisfy FCRA's "firm offer" allowance. *See Cole*, 389 F.3d at 729 n. 11(quoting the following language of section 1681m: "[a]ny person who uses a consumer report on any consumer in connection with any credit or insurance transaction that is not initiated by the consumer, *that is provided to that person under section 1681b(c)(1)(B) of this title [a firm offer of credit or insurance]*, shall provide with each written solicitation made to the consumer regarding the transaction.") (emphasis added); *see also Bonner v. Home123 Corp.*, 2007 WL 778447, at *11 (N.D. Ind. March 9, 2007). Therefore, in light of this Court's ruling that Defendant failed to meet the requirements of a "firm offer" under FCRA, Plaintiff has no additional claim under section 1681m. Defendant's motion for summary judgment is GRANTED with respect to this issue as it is mooted by this Court's ruling on the lack of a "firm offer."

c.    Whether FCRA violations were willful

The only remaining question regarding Defendant's liability under FCRA is whether or not GMACM's failure to comply with the "firm offer" requirement was willfull, as required under section 1681n. Defendant asserts that it is entitled to summary judgment on this issue because Murray has advanced no evidence on which a jury could find willfulness, and that the FCRA compliance procedures GMACM has adopted prove that it made every effort to follow the law. *See* Def.'s Summ. J. Mem. at 13-18. If anything, Defendant claims, the record points to negligence or mistake on its part.

If a plaintiff can demonstrate that a reporting agency or creditor willfully failed to comply with a requirement under FCRA, then he or she can recover statutory damages under the statute. *See* 15 U.S.C. § 1681n. However, the statutory language repeatedly makes clear that liability under this section applies only to "willful noncompliance." *Id.* To establish a willful violation of FCRA, Murray must be able to demonstrate that Defendant "knowingly and intentionally" violated the statute and, in so doing, was "conscious" that its acts "impinge[d] on the rights of others." *Ruffin-Thompkins*, 422 F.3d at 610 (quoting *Wantz v. Experian Info. Solutions*, 386 F.3d 829, 834 (7th Cir. 2004)) (citing *Phillips v. Grendahl*, 312 F.3d 357, 368 (8th Cir.2002)).

GMACM asserts that there is no evidence that it knew that the mailer violated FCRA. Instead, GMACM contends that its involvement with the mailer was negligent, at worst, but does not rise to the level of willfulness. Defendant has established that it had an extensive process of considering FCRA compliance and had a great many parties involved in the process. Moreover, the flyer was created and mailed prior to the *Cole* decision; according to whatever investigation

they made into FCRA standards at the time of the mailing, Defendant alleges that it would have reasonably believed that the flyer complied with pre- *Cole* interpretations of the statute. Plaintiff responds that willfulness can be implied from the conspicuousness of failing to list any details in the mailers, and the fact that GMACM's compliance personnel weren't familiar with the terms of the loans they claimed to have been offering. *See* Pl.'s Summ. J. Resp. at 6. Plaintiff contends that the state of the law at the time made clear enough that the mailing here was in violation.

It is true that *Cole* had not been decided at the time of this mailing, and that those who reviewed the mailing therefore did not have access to the most important clarifying opinion on this issue. Defendant's claim of mere negligence therefore should be given some credence, in light of the distinction in FCRA between mere mistake, which requires that plaintiffs suffer actual damages to bring an action, and willful acts, such as the allegations at issue here. In light of the several layers of oversight that were in place before the instant mailing went out, it is arguable that willfulness was lacking.

Defendant is also correct that there is very little concrete evidence that GMACM was "on notice that its actions [were] unlawful." *See Murray v. New Cingular Wireless*, 432 F.Supp.2d 788, (N.D. Ill. May 22, 2006) (citing *Ruffin Thompkins*). Largely, Plaintiff relies on the egregiousness of the violations as proof that the parties acted willfully, pointing to the fact that the mailer "is so obviously in noncompliance that his conclusion creates an issue of [Defendant's consulting counsel]'s credibility." *See, e.g.,* Resp. to Def.'s Facts ¶¶ 7. Such an assertion that GMACM parties lacked credibility is not necessarily evidence of the willfulness required to sustain this action, above and beyond mere incompetence or negligence. Nonetheless, courts have found that an offer so obviously different from a "firm offer" can provide evidence of a

willful choice to ignore FCRA's requirements.  *See Kudlicki v. Farragut Fin. Corp.*, 2006 WL 927281, at *2-3 (N.D. Ill. 2006) ("It is clear from the most cursory glance at defendant's mailer that no firm offer of credit is being extended, and no compliance examiner could conclude otherwise").  *Kudlicki* is not entirely on point, as the court in that case made no mention of which standards or definitions of "firm offer" factored into its decision to grant summary judgment for plaintiff.  However, we look to it only as support for finding that a mailing might depart so far from a "firm offer" that willfulness can be inferred.  In the instant case we are not echoing *Kudlicki* in holding that willfulness should be found as a matter of law, only that the degree of the violation alone provides some evidence on which a reasonable jury might so find.

It is not surprising that Plaintiff has been unable to produce a smoking gun, or some document in which a GMACM employee simply admits that they knew what they were doing was wrong but did it anyway.  Such documents or testimony will rarely if ever be recovered.  Instead, the ultimate determination will be made via circumstantial evidence.  The believability of witnesses and the obviousness of the error can amount to such evidence, but involve close questions of credibility that cannot be answered here.  *See, e.g., Collier v. Budd*, 66 F.3d 886, 893 (7th Cir. 1995).  There is at least a question as to whether or not GMACM compliance officers are to be found credible, and this question should be determined by a factfinder rather than by this Court as a matter of law.

After reviewing the facts and the record and making all reasonable inferences in favor of GMACM regarding Murray's willful noncompliance claim, this Court is unable to conclude that Defendant acted willfully as a matter of law.  The state of the law being what it was at the time this mailing was produced makes it possible that a reasonable factfinder could find that

Defendant actually tried its best to comply with FCRA's demands.  However, this Court is likewise unable to conclude as a matter of law that the Defendant did not act willfully.  Issues of disputed material fact remain regarding whether Defendant willfully violated FCRA when it mailed out the "Pre-Approved Notice."  *See Phillips*, 312 F.3d at 370-71; *see also Murray v. Fin. Am., LLC*, No. 05 C 1255, 2006 WL 862832, at *4 (N.D. Ill. April 4, 2006).

Thus, this Court finds that Defendant violated FCRA by failing to provide a "firm offer of credit."  This Court further finds that the required "clear and conspicuous" disclosures cannot be considered in the absence of a valid "firm offer."  On the issue of willful noncompliance, summary judgment is inappropriate because disputed issues of material fact remain.  For these reasons, Plaintiff's motion for Summary Judgment is GRANTED in part and DENIED in part, and Defendant's motion for summary judgment is GRANTED in part and DENIED in part.  Summary judgment is granted against the "§1681m(d)" class in its entirety.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for class certification is GRANTED.

Defendant's motion for summary judgment, and Plaintiff's motion for summary judgment, are

GRANTED in part and DENIED in part.

Enter:

/s/ David H. Coar

_____
David H. Coar
United States District Judge

Dated: **April 10, 2007**